[No. A113310. First Dist., Div. Five. Nov. 8, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
SUE CAROLE DILLON et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II. of the Discussion.

**COUNSEL**

Corinne S. Shulman, under appointment by the Court of Appeal, for Defendant and Appellant Sue Carole Dillon.

David S. Krueger, under appointment by the Court of Appeal, for Defendant and Appellant Patrick Joseph Dillon.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Catherine A. Rivlin and Allan Yannow, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**JONES, P. J.**—Sue Carole Dillon (Sue Dillon) appeals her convictions by jury verdict of cultivation of marijuana (Health & Saf. Code, § 11358;[1] count one), possession of marijuana for sale (§ 11359; count two), and making a place available for use for the manufacture, storage, or distribution of a controlled substance (§ 11366.5, subd. (a); count three). She contends there was insufficient evidence to support any of the counts against her. Patrick Joseph Dillon (Patrick) was convicted in the same trial of the same three counts. He appeals his conviction of count three only, on the grounds of insufficient evidence.

## BACKGROUND

*Chicago Search*

On May 8, 2003, Chicago police were alerted by a canine patrol to an Express Mail package addressed to Gerry Heffernan (Heffernan) in Chicago. The return address on the package was "Computech" in San Diego, but the receipt for the package bore an Arcata Zip code. The police obtained a search warrant and searched the package. It contained four vacuum-sealed bags of green plant material that tested positive for cannabis. Each bag weighed approximately 400 grams.

The package was delivered to Heffernan's residence on May 12, 2003, with an implanted device that signaled the police when it was opened. The police executed a search warrant when the device activated. They found the cannabis in Heffernan's basement, where they also found a gram scale and packing material. In his living quarters they found two customer copies of Express Mail forms showing packages addressed to Patrick J. Dillon in Kneeland, California.[2] One receipt was for a two-pound package mailed that same morning. They found an undated handwritten letter to "Gerry" from "Pat." The letter spoke of Pat's concern that Gerry was "many thousands short of what you owe. I cannot continue to supply you unless we can reconcile the discrepancy." The letter continued with a suggestion for keeping "our connection open. [Y]our price for a typical pound of product will be $2,500. If you sell a hundred and twenty-eight units at $50 per, you should gross $6,400 per pound. . . . If I can supply two pounds per cycle (one pound per month) at $2,500, beyond that each pound of greater quality will be $3,800. This means you need to move at least a hundred and twenty-eight units to pay your bill and net $3,000 per month. If you think you can do this,

---

[1] All further section references are to the Health and Safety Code.

[2] Kneeland is approximately 10 miles southeast of Arcata.

call me and we'll set up a cycle. Thanks. Your bro. P.S[.] you will need to keep a running total and take your bill off the top. Make sure one is paid for before you open another. If you have some ideas let me hear them. Pat." The prices in the letter were consistent with the Chicago price of hydrogrown marijuana.

Following the search the police intercepted the package Heffernan had sent to Patrick that morning. It contained $20,240 in cash, primarily in $20 bills, the denomination customarily used in street purchase of marijuana. The Greenwood Heights Road address in Kneeland to which the package was sent is on property that belongs to Patrick and Sue Dillon. Patrick attempted to claim this money after it was forfeited. He was unsuccessful because his claim provided no reason that the money belonged to him. Sue Dillon did not make a claim.

Between June 2002 and April 2003 the Kneeland postmaster received and delivered 13 Express Mail packages from Chicago addressed to Patrick Dillon. They weighed between five ounces and three pounds. Between December 2002 and May 2003 seven packages weighing between six and nine pounds were mailed to Heffernan by Express Mail from Eureka, Arcata or McKinleyville, cities within a few miles of each other in Humboldt County.

A postal inspector who qualified as an expert in detection of controlled substances testified that Express Mail is used by narcotics traffickers because it allows an item to be tracked. He also testified that, in his experience, five- to 20-pound packages of contraband are shipped from the source area, and one- to two-pound packages containing funds are shipped to the source.

Both the postal inspector and a Department of Justice agent who qualified as an expert in marijuana cultivation and possession for sale testified that the letter from "Pat" to "Gerry" was discussing the mailing, sale and return of funds from marijuana sales.

*Kneeland Search*

On May 15, 2003, the day after the package with the cash from Heffernan to Patrick was intercepted, the Humboldt County sheriffs executed a search warrant on the Dillons' Kneeland property, which contained a one-story and a two-story residential structure. A footpath led from the one-story structure to a detached building approximately 35 yards distant. The detached building, identified at trial as the grow shed, was obscured from the residential buildings by brush and trees. The path had a "very mild" downhill slope. Along the path were black garbage bags containing rootballs and cut marijuana stalks, stems, and leaves. One room of the grow shed contained 17

freshly watered cloned marijuana plants, two-to-three-feet tall. The building had electric timers set on an eight-hour cycle, fans, carbon filters, drip irrigation system, grow lights and hoods, and rootballs from recently cut marijuana plants. Deputy Sheriff Ronald Prose, who participated in the search, opined that the size of the operation in the building was consistent with a commercial operation.

The search team found indicia of Sue and Patrick Dillon's residence on the property. It found no indicia of any other occupants. The team found Express Mail customer receipts bearing Heffernan's name. The return address on the receipts was for Computech at 736 F Street, Arcata. There is no Computech at that address; it is city offices. The team found airplane tickets to Chicago for Patrick and Sue Dillon, an address book containing Heffernan's name and Chicago telephone number with an entry for Computech at 736 F Street, Arcata, immediately below his name, and "how to" books on marijuana. They found no indicia of personal use of marijuana or records of drug transactions.

On the day of the search Deputy Sheriff Carla Bolton was dispatched to the intersection of Kneeland Road and Greenwood Heights Road. It is the first intersection from which one is able to turn to reach the Dillons' residence, which is approximately 4.2 miles from the intersection. Sheriff Bolton observed freshly cut marijuana plants piled up along the road. The search team recovered 78 flowering plants and other starter plants from the area of the intersection. The plants were cut similarly to the stems at the Dillon residence. The diameter of the stalks was similar to the stems in the rootballs at the Dillon residence. The starter plants were clones and in the same peat moss as the larger plants at the residence. The plants differed from the plants at the Dillon residence only by being at a different growth stage. The growth cycle of a marijuana plant is approximately three months.

While searching a commercial storage unit rented by appellants the search team found transformers that create power to keep lights on.

*Defense*

An expert in marijuana cultivation opined that the amount of marijuana on the Dillon property and the electrical usage was consistent with personal medical use. He also opined that, without genetic testing, there could be no determination that the plants found at the Kneeland Road/Greenwood Heights Road intersection were from those grown on the Dillon property.

Patrick testified that he and Sue Dillon have lived in the two separate residences since their divorce in 1999. Under the terms of their divorce agreement, he turned over all rights to the property to her and paid her $600

per month as rent for the two-story residence. She was to act as his caretaker until the property was sold.

Patrick retired in 1998 after suffering heart problems and a spinal injury. He began using marijuana on the recommendation of two doctors who said it could relieve his health problems, which also included injuries he had received in a fireplace explosion. He began growing it in 2001 in the grow shed, which he converted from a storage shed, because he did not like the insecticides used on the marijuana he purchased elsewhere. He generally got 12 to 13 ounces per crop. He denied having any connection with the marijuana plants found at the intersection and stated he could not have stacked them in the way they were found because of his physical disability. Sue Dillon did not know he was growing marijuana. She left to visit her daughter in Georgia the week before the search of their property and returned a week after the search. Patrick denied ever sending marijuana to Heffernan, his younger half brother. The $20,240 sent by Heffernan was for an addition to Sue Dillon's residence.

Heffernan testified that he sent books, magazines, and massage equipment to Patrick by Express Mail. He denied that Patrick ever sent him marijuana or anything else. He did not know who sent the package with the marijuana that resulted in the search of his Chicago residence. Two months earlier he had received a package with a return address of Computech, Inc., on F Street, Arcata. It contained loaves of bread and smoked salmon. He telephoned the Dillons to see if they had sent it. When they said, "no," he asked Sue Dillon to "check out" the return address. He had visited their property and knew that the Dillons occupied separate quarters. At Sue Dillon's request, Heffernan sent the $20,240 as a loan for improvements to the property, with the understanding he would be repaid $25,000 when the property was sold. He addressed the package to Patrick because he understood Sue Dillon would not be home. The money was the remainder of his inheritance from his father. He sent cash because he does not keep money in banks; another brother had previously created problems by raiding their joint bank account. He did not send a cashier's check because of the likely "hassle[]" from bank personnel.

Peggy Dillon is Patrick's older sister. She lives in San Diego. They have a different father from their younger half brothers, Gerry and Joe Heffernan. She testified that the family knew Gerry Heffernan kept significant amounts of cash, which he received from the large inheritance from his father, and that he disliked banks.

Sue Dillon confirmed that Patrick signed all his assets over to her when they divorced in order to make him eligible for needed medical treatment. In exchange, she agreed to be his caretaker. She had not been to the storage

structure for three years because the path is a slippery downward slope, and the last time she walked on it she fell and broke her wrist. She understood that the structure was not in use. She knew Patrick smoked marijuana on medical recommendation but did not know he was growing it. She added the Arcata Computech F Street address under Heffernan's name in the address book she shared with Patrick sometime before the May 2003 search because Heffernan had telephoned them to say he had received a package from that address and wanted them to "check [it] out."

Sue Dillon planned to sell the property in May 2003. After she and Heffernan discussed his lending her the money for an improvement, she sent him a copy of the $20,240 estimate from Six Rivers Solar to add a sunroom. She instructed him to send the money to Patrick because she was going to be away.

The owner of Six Rivers Solar, Inc., Norman Ehrlich, testified that his company installed a sunroom on appellants' property in May 2003. Mr. Ehrlich gave them estimates of $12,000 for the sunroom kit because they originally planned to install it themselves, and $8,240 for his company's labor and materials installation charge. Appellants gave the company a check on April 30, 2003, for $12,000, which they asked the company to hold until they received the funds. The owner telephoned the bank approximately one week later and was told the funds had been deposited, but when the company bookkeeper then tried to deposit the check the funds had been frozen.

*Sentence*

The court suspended imposition of sentence and placed appellants on probation for three years.

## DISCUSSION

I. *Count Three, Violation of Section 11366.5, Subdivision (a)*

Both Patrick and Sue Dillon contend there was insufficient evidence to support their respective convictions of count three, making a building available for use for manufacture of a controlled substance. (§ 11366.5, subd. (a).)

The standard of review on a claim of insufficient evidence is well settled. The reviewing court determines whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Moon* (2005) 37 Cal.4th 1, 22 [32 Cal.Rptr.3d 894, 117 P.3d 591].) The court examines the record to determine if it shows evidence that is

reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt, but "it must be ever cognizant that 'it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends . . . .' " (*People v. Barnes* (1986) 42 Cal.3d 284, 303 [228 Cal.Rptr. 228, 721 P.2d 110], quoting *People v. Thornton* (1974) 11 Cal.3d 738, 754 [114 Cal.Rptr. 467, 523 P.2d 267].) It presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*Moon, supra,* 37 Cal.4th at p. 22.)

Section 11366.5, subdivision (a) provides, in pertinent part: "Any person who has under his or her management or control any building . . . as an owner . . . who knowingly rents, leases, or makes available for use, with or without compensation, the building . . . for the purpose of unlawfully manufacturing, storing, or distributing any controlled substance for sale or distribution shall be punished . . . ." Patrick argues that the property owner violates this statute only when he or she makes the property available to a third party for manufacture, etc., of a controlled substance; there is no violation of this statute when the manufacturing is undertaken solely by the owners. Therefore, Patrick argues, because there was no evidence of any third party cultivating marijuana on the Dillons' property, he could not be in violation of this statute.

Sue Dillon argues there was no evidence that connected her to the grow shed or the cultivation and sale of marijuana. Nor was there any evidence that she knowingly permitted cultivation to take place in the grow building.

■ Courts are to give effect to statutes according to the usual, ordinary import of the words used in the statute. (*Woosley v. State of California* (1992) 3 Cal.4th 758, 775 [13 Cal.Rptr.2d 30, 838 P.2d 758].) If the statute's language is clear and unambiguous, its provisions should be applied according to their terms without further judicial construction so long as their meaning is in accord with the purpose of the statute. (*People v. Snook* (1997) 16 Cal.4th 1210, 1216–1217 [69 Cal.Rptr.2d 615, 947 P.2d 808].) If the statute is not ambiguous, courts presume the Legislature means what it said. (*In re Young* (2004) 32 Cal.4th 900, 906 [12 Cal.Rptr.3d 48, 87 P.3d 797].)

By their customary meaning the active verbs used in section 11366.5, subdivision (a)—"rent[]," "lease[]," and "make[] available"—contemplate a transaction between two parties: the person(s) with authority to determine the property's use and the person(s) without authority who seeks to use the property. These verbs do not connote actions that are undertaken by property owners at their own instigation for their own behalf and that do not involve other people. Persons authorized to determine the property's use who want

the property for their personal use only have no need to, and do not make the property available to themselves. It is already available to them.

That these verbs are modified by the phrase "with or without compensation" further connotes that the statute requires a transaction between two parties. The requirement for compensation customarily arises when one person wants to make use of something belonging to or under the control of another person. Questions of compensation do not arise when a person is making sole use of his or her own property.

■ By giving the words of section 11366.5, subdivision (a) their usual meaning, we agree with appellants that violation of this statute requires that the property owner or manager be proven to have allowed a third party use of the property for manufacturing, storing, or distributing a controlled substance. There is no violation if the person(s) who controls the property is the only one using it to manufacture the controlled substance.

The People do not dispute that appellants were the only people apparently using their property to cultivate marijuana. They rely on language in *People v. Sanchez* (1994) 27 Cal.App.4th 918 [33 Cal.Rptr.2d 155] to argue that section 11366.5, subdivision (a) can be violated by the property owner acting alone. In *Sanchez*, several men used the defendant's house to manufacturer methamphetamine. (27 Cal.App.4th at p. 921.) The defendant was convicted of aiding and abetting the manufacture, a violation of section 11379.6. (27 Cal.App.4th at p. 920.) On appeal, the defendant argued that section 11379.5 precluded his conviction of aiding and abetting, citing the general rule that prosecution under a general statute, i.e., section 11379.6, is precluded when a specific or special statute, i.e., section 11379.5, covers much of the same subject as the more general statute, so that violation of the specific statute will necessarily result in violation of the more general statute. (27 Cal.App.4th at p. 922.) The *Sanchez* court disagreed, noting that the elements of the two statutes did not correspond. It observed that conviction under section 11366.5 requires proof that "(1) the accused knowingly permitted a controlled substance to be manufactured or stored; (2) for the purpose of sale or distribution to others; (3) in a building under his or her management or control." (27 Cal.App.4th at p. 923.) In other words, it requires that the accused have knowledge that the substance is being manufactured or stored for the purpose of sale or distribution to others. (*Ibid.*) By contrast, *Sanchez* observed, section 11366.6 has no such knowledge requirement. It requires that the accused have the specific intent to facilitate the manufacturing process. (27 Cal.App.4th at p. 923.)

*Sanchez* does not assist the People. Language in an opinion must be understood in light of the facts and issues then before the court; the opinion is

not authority for a proposition not considered therein. (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].) At issue in *Sanchez* was the correct offense to charge when, undisputedly, the actual manufacturer of the controlled substance was someone other than the person in control of the property. In any case, *Sanchez*'s use of the phrase "the accused . . . permitted" in its recitation of the first element of section 11366.5 is the court's recognition that this statute requires a two-party transaction. The common understanding of "permission" is a right granted by one person with authority to do so to another person.

The People also rely on *People v. Costa* (1991) 1 Cal.App.4th 1201 [2 Cal.Rptr.2d 720] (*Costa*). In *Costa* paraphernalia for methamphetamine manufacture was found in the defendants' house. (*Id.* at p. 1205.) The defendant husband acknowledged that he gave a friend permission to use the garage of the house to make a controlled substance. (*Id.* at p. 1210.) The jury was instructed that the People had to prove (1) the defendants knowingly "permitted" a controlled substance to be manufactured or stored; (2) in a building under their management or control. (*Id.* at p. 1205.)

The principal issue in *Costa* was whether the trial court erred in failing to add that violation of section 11366.5 requires proof that the prohibited manufacture be "for sale or distribution." (*Costa, supra,* 1 Cal.App.4th at p. 1208.) The defendants argued that the phrase was intended to modify the unlawful "manufacturing," "storing," *and* "distributing." (*Id.* at p. 1205.) The People argued that it was intended to modify only "distributing." (*Ibid.*)

*Costa* concluded the qualifying phrase was intended to modify all three activities. (*Costa, supra,* 1 Cal.App.4th at p. 1206.) In reaching its conclusion it observed that section 11366.5 was introduced as part of the same bill that introduced section 11366.7, which prohibits the sale of chemicals and drug apparatus with knowledge that they will be used in the manufacture of controlled substances for sale or distribution. "The stated purpose of the bill was to reach owners or managers of property[,] and retailers or wholesalers of chemicals[,] for their illegal activities. In both sections, the Legislature wanted to reach people who aided those engaged in manufacturing controlled substances for sale or distribution to others. . . . [¶] [Versions of the bill] show that the expressed intent in enacting section 11366.5 was to reach the manufacturing, storing, and distributing of controlled substances undertaken for the purpose of sale or distribution to others. . . . [¶] . . . [T]he general goal of the statute [through the amending process] remained constant. The Legislature sought to reach landlords and others who knowingly allowed the manufacturing or storage of controlled substances for sale or distribution to other persons to take place on premises they owned or managed." (1 Cal.App.4th at pp. 1206–1207.) The People assert that this legislative

purpose, as recited in *Costa*, shows that section 11366.5 covers use of a building for manufacture irrespective of whether the controlled substance belongs to the person who has ownership or control of the building.

Because of its differing facts and issues, *Costa* does not assist the People. First, there is nothing in *Costa* to suggest that only the defendant homeowners were manufacturing methamphetamine. Not only did the defendant husband admit allowing a friend to use the garage for manufacture of a controlled substance, the jury was instructed that the defendants "permitted" the manufacture. *Costa* did not hold the instruction wrong for its use of "permitted," with its customary meaning of one person allowing another person to do something. *Costa* held it erroneous for its omission of the element "for sale or distribution."

Second, *Costa* specifically limited its statutory construction to what words were qualified by the phrase "for sale or distribution." Its construction was not intended to express the court's view "on the possible interpretations of other language in this statute." (*Costa, supra,* 1 Cal.App.4th at p. 1206, fn. 2.) Thus, *Costa* is not authority for the statute's application to a property owner or manager's own manufacture of a controlled substance.

■ Third, courts resort to extrinsic sources such as legislative history only when a statute is ambiguous. (*In re Young, supra,* 32 Cal.4th at p. 906.) Regardless of whether section 11366.5 is ambiguous regarding the actions the phrase "for sale or distribution" was intended to modify, as *Costa* impliedly concluded, it is not ambiguous as to its requirement that the defendant must have made his or her property available to another person to use for manufacture. Thus, we need not consider the legislative history. In fact, however, it bolsters our conclusion. As *Costa* noted, this statute was introduced as part of the same bill that enacted section 11366.7, which forbids the sale of paraphernalia for the manufacture of a controlled substance with knowledge of the paraphernalia's intended use. Like the activities of renting, leasing, and making property available for use in section 11366.5, selling is a two-party transaction. As *Costa* further noted, this bill was intended to punish those who aid or enable other people to manufacture controlled substances by providing the necessities for manufacture: space, devices, and raw ingredients. People who themselves perform the manufacture are subject to punishment under other statutes.

■ In the absence of evidence that appellants permitted a third party or parties to use their property for cultivation of the marijuana discovered there, their conviction for violation of section 11366.5 must be reversed and cannot be retried.

II.  *Violation of Counts One and Two—Sue Dillon**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgments of conviction on count three are reversed as to Sue Dillon and Patrick Dillon. The judgments are affirmed on counts one and two.

Simons, J., and Needham, J., concurred.

A petition for a rehearing was denied December 10, 2007, and appellants' petition for review by the Supreme Court was denied February 13, 2008, S158670.

---

*See footnote, *ante*, page 1037.