EDMUND G. BROWN JR. Attorney General TAYLOR S. CAREY Deputy Attorney General
THE HONORABLE QUENTIN L. KOPP, CHAIRMAN, CALIFORNIA HIGHSPEED RAIL AUTHORITY, has requested an opinion on the following question:
Is the California High-Speed Rail Authority authorized to exercise the powers set forth in Public Utilities Code section 185036?
 CONCLUSION
The California High-Speed Rail Authority is authorized to exercise the powers set forth in Public Utilities Code section 185036. It received partial authority to exercise those powers through legislation, and full authority on November 4, 2008, through the passage of the Safe, Reliable High-Speed Passenger Train Bond Act for the 21st Century. *Page 2 
 ANALYSIS
The California High-Speed Rail Authority (HSRA) was created by the California High-Speed Rail Act of 1996 for the purpose of developing a plan for the financing, construction, and operation of a statewide, intercity high-speed passenger rail system.[1] The HSRA was required to submit its business plan to the Legislature and the Governor for consideration and approval.[2]
In June 2000, the HSRA adopted its final business plan, following which the Legislature appropriated funds to the HSRA "for the purpose of commencing preliminary environmental documentation for the implementation of high speed rail service in California."[3] The business plan contemplates a rail system with speeds exceeding 200 mile per hour, extending from San Diego through the population centers of Southern California, continuing through the Central Valley, and terminating in segments located in Sacramento and in the San Francisco Bay Area.[4] The HSRA has recommended a phased-project approach, beginning with initial environmental studies, and proceeding through preservation of needed rights-of-way as well as additional studies to determine train technology, to finalize corridors and station locations, and to sharpen cost estimates.[5] The HSRA's plan also advocates increased funding and accelerated development for complementary intercity and commuter rail services and improvements.[6]
In 2002, the Legislature enacted the Safe, Reliable High-Speed Passenger Train Bond Act for the 21st Century (Bond Act), [7] to add Chapter 20 (commencing with section 2704) to Division 3 of the Streets and Highways Code relating to financing and constructing a high-speed passenger train system. The Bond Act was originally scheduled to be submitted for voter approval on the November 2004 Ballot, but it was *Page 3 
postponed twice.[8] It appeared on the November 2008 Ballot. The Bond Act provides for the issuance of general obligation bonds, the bulk of the proceeds from which are to be used in conjunction with available federal funds for funding the planning and construction of a high-speed rail system pursuant to the HSRA's business plan. A portion of the revenues are to be available for capital projects on other passenger rail lines to provide connectivity to the high-speed train system and for capacity enhancements and safety improvements to those lines.[9]
Public Utilities Code section 185036, which is part of the California High-Speed Rail Act, [10] provides:
 Upon approval by the Legislature, by the enactment of a statute, or approval by the voters of a financial plan providing the necessary funding for the construction of a high-speed network, the authority may do any of the following:
 (a) Enter into contracts with private or public entities for the design, construction and operation of high-speed trains. The contracts may be separated into individual tasks or segments or may include all tasks and segments, including a design-build or design-build-operate contract.
 (b) Acquire rights-of-way through purchase or eminent domain.
 (c) Issue debt, secured by pledges of state funds, federal grants, or project revenues. The pledge of state funds shall be limited to those funds expressly authorized by statute or voter-approved initiatives.
 (d) Enter into cooperative or joint development agreements with local governments or private entities.
 (e) Set fares and schedules.
 (f) Relocate highways and utilities. *Page 4 
We are asked whether the necessary approval has been given for full implementation of section 185036. We conclude that approval has now been given, although it came about in two discrete phases. First, the Legislature authorized and funded a limited set of specific, discrete, preliminary projects which the HSRA could undertake. Second, the Legislature enacted a bond measure that was sufficient to authorize full implementation of the project, but provided that the measure would become operative only upon voter approval. For the sake of completeness and clarity as the project moves forward, we explain both phases below.
Phase 1: Partial Approval by Legislature
Our interpretation of section 185036 and related statutes is guided by well-settled principles of statutory construction, the fundamental rule of which is to ascertain the intent of the Legislature so as to effectuate the purpose of the law.[11] We are further instructed that "[i]f the statute's language is clear and unambiguous, its provisions should be applied according to their terms without further judicial construction so long as their meaning is in accord with the purpose of the statute."[12] But, when, as here, a statute is capable of more than one construction, "[w]e must . . . give the provision a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the lawmakers. . . ."[13] When construing a statute susceptible of more than one reasonable interpretation, we look to a variety of extrinsic aids, including the objects to be achieved, the legislative history, and the statutory scheme of which the statute is a part.[14] We are further instructed to give "the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose."[15]
The provisions of section 185036 are not self-executing, but contingent upon prescribed events to become operative. The introductory paragraph of section 185036 *Page 5 
provides that the alphabetized subdivisions may be implemented upon "approval" obtained from the Legislature by way of a statutory enactment, or, in the alternative, from the voters by passage "of a financial plan providing the necessary funding for the construction of a high-speed network." We have gleaned from the legislative history of section 185036 that the requirement for voter approval of a financial plan refers, in practical effect, to passage of a voter-approved measure such as the Bond Act.
In contrast to the relatively easily understood reference to measures subject to direct voter approval, comparable to the Bond Act, the particular components or characteristics of what is meant by legislative approval — whether it is to be given explicitly, by implication, or derived from reasonable inference — are not so easily ascertained. We know, however, that the statutory scheme, of which section 185036 is a part, is broadly devoted to designing, building, and operating a high-speed rail network. Therefore, we believe it is appropriate to construe legislative "approval" to mean "to give formal or official sanction to,"[16] which is consistent with the purposes of a statutory scheme that is devoted to bringing a high-speed rail project into being.
"It is, of course, always preferable for the Legislature to speak clearly and avoid ambiguity, but this certainly does not mean that when it does not do so a court cannot ascertain legislative intent by going beyond the language and examining the legislative history of the statute. . . ."[17] Because section 185036 recites that the Legislature's approval is to come by way of a statute, we have examined subsequent enactments referencing the high-speed rail network for indications that complete statutory approval was ever given. Although we have located no act expressly approving the implementation of section 185036, we have located enactments since the adoption of the HSRA's business plan and the enactment of the Bond Act by which the Legislature signaled its continuing support for the project. For example, it appropriated money for the HSRA to pay for preliminary environmental documentation;[18] for general support of the High-Speed Rail Authority;[19] to pay the costs of any legal challenge to the *Page 6 
Environmental Impact Report/Environmental Impact Statement;[20] to develop a financing plan; and to complete an EIR/EIS for the proposed northern crossing.[21] None of these actions directly implicated the provisions of section 185036.
But we find that, in Assembly Bill 1801 (2006), [22] the Legislature also specifically appropriated funds for the commencement of "site-specific environmental work, right-of-way acquisition, and identification of necessary grade separations to improve and preserve rail corridors."[23] Though AB 1801 did not refer specifically to section 185306, the Legislature is presumed to know the existing statutory schemes of which its new enactments become a part.[24] The projects described in AB 1801 correspond closely to section 185036(b), which authorize the HSRA to "[a]cquire rights-of-way through purchase or eminent domain," and therefore, we conclude, constituted legislative approval for partial implementation of section 185036.
It would be an overstatement, however, to extrapolate from the abbreviated authority contained in AB 1801 that the Legislature also intended to approve full implementation of section 185036. Our construction of a statute does not require that we ignore practical realities. Instead "[w]e must . . . give the provision a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the lawmakers, practical rather than technical in nature, which upon application will result in wise policy rather than mischief or absurdity."[25] Therefore, in addressing the scope of approval given to the HSRA in AB 1801 we must place it in context, taking into account the magnitude of the entire high-speed rail project and giving due consideration not only to what the Legislature authorized, but also to what it withheld. *Page 7 
Of the bill's total appropriation for the HSRA of $14,298 million, $13 million is allocated for the commencement of the three specified projects. Viewed in light of the $9.95 billion proposed to be raised in the Bond Act, and the estimated $33 billion total cost of the HSRA network, [26] the funds appropriated by AB 1801 represent a fairly small portion. We can reasonably infer from the relative modesty of the appropriation that the Legislature did not intend to approve wholesale implementation of section 185036.[27] Instead, it gave its approval to the HSRA to engage in discrete projects in furtherance of the long-term objectives of the high-speed rail project.
We conclude, therefore, that while AB 1801 did amount to "approval . . . by the enactment of a statute,"[28] the approval was restricted to the projects and activities designated in the bill, and did not constitute general approval for the implementation of section 185036 as a whole.
Phase 2: Plenary Approval by Voters
Unlike the limited approval given by AB 1801, passage of the Bond Act constitutes the full "approval by the voters of a financial plan providing the necessary funding for the construction of a high-speed network," which will permit the HSRA to undertake full-scale implementation of the rail project. We are aware that the phrase "necessary funding" used in section 185036 could be construed to mean all of the funding necessary to see construction of the high-speed rail system from start to finish. We reject that interpretation for the following reasons.
The Bond Act is designed to give effect to an extensive statutory scheme, commencing with section 2704 of the Streets and Highways Code, for the financing, design, construction and operation of a high-speed rail project under the direction of the HSRA.[29] Streets and Highways Code section 2704.04 (a) recites that it is "the intent of *Page 8 
the Legislature by enacting this chapter and of the people of California by approving the bond measure pursuant to this chapter to initiate theconstruction of a high-speed train network consistent with the authority's Final Business Plan of June 2000."[30] An uncodified portion of the enabling legislation expresses the intent of the Legislature "that the entire high-speed train system shall be constructed as quickly as possible in order to maximize ridership and the mobility of Californians."[31] It provides for the issuance of $9.95 billion of general obligation bonds, [32] $9 billion of which is to be used in conjunction with available federal money for funding the planning and construction of a high-speed train system according to the HSRA's plan.[33] The revenues raised by the Bond Act are not the only funds that will be sought for the construction of the system. "The high-speed passenger train bond funds are intended to encourage the federal government and the private sector to make a significant contribution toward the construction of the high-speed train network."[34] In this manner the Legislature intends to appeal to and utilize multiple sources of funding necessary to complete the project. For purposes of the approval required by section 185036, however, it is enough.
We conclude, therefore, that the Bond Act grants the HSRA authority to proceed with the implementation not only of section 185036, but of the entire statutory framework established to bring the high-speed rail network into reality.
[1] 1996 Cal. Stat. ch. 796 (SB 1420).
[2] Pub. Util. Code § 185032.
[3] 2000 Cal. Stat. ch. 91, § 22 (AB 2928).
[4] See http://www.cahighspeedrail.ca.gov (implementation plan).
[5] Id.
[6] Id.
[7] 2002 Cal. Stat. ch. 697 (SB 1856).
[8] 2006 Cal. Stat. ch. 44 (AB 713); 2004 Cal. Stat. ch. 71 (AB 1169).
[9] See, e.g., 2002 Cal. Stat. ch. 697, as amended by 2004 Cal. Stat. ch. 71, § 1(e); Sts. High. Code §§ 2704.04(b)(1), (b)(2), 2704.07, 2704.08, 2704.10, 2704.13.
[10] Pub. Util. Code §§ 180000, et seq.
[11] T. M. Cobb Co. v. Superior Court, 36 Cal. 3d 273, 277
(1984).
[12] People v. Dillon, 156 Cal. App. 4th 1037, 1044 (2007).
[13] Gattuso v. Harte-Hanks Shoppers, Inc., 42 Cal. 4th 554, 567
(2007).
[14] In re Derrick B., 39 Cal. 4th 535, 539 (2006).
[15] Dyna-Med, Inc. v. Fair Employment Housing Commn.,43 Cal. 3d 1379, 1387 (1987).
[16] Merriam-Webster's Collegiate Dictionary, 10th ed. (1999).
[17] Coastside Fishing Club v. Cal. Resources Agency, 158 Cal. App. 4th 1183, 1202 (2008).
[18] 2000 Cal. Stat. ch. 91 (AB 2928).
[19] 2005 Cal. Stat. ch. 208 (SB 1113).
[20] 2005 Cal. Stat. ch. 38 (SB 77).
[21] 2006 Cal. Stat. ch. 47 (AB 1801).
[22] Id.
[23] Id.
[24] In re James H., 154 Cal. App. 4th 1078, 1085 (2007) (presumption that Legislature is aware of existing related laws and intends to maintain consistent body of rules).
[25] Gattuso, 42 Cal. 4th at 567.
[26] See http://www.cahighspeedrail.ca.gov (implementation plan).
[27] This point is underscored by California Constitution article XVI, section 1, which prohibits the Legislature from creating indebtedness in excess of $300,000 except under specific conditions not present here.
[28] Pub. Util. Code § 185036.
[29] Although the Bond Act was enacted in 2002, the Legislature exercised its prerogative to condition the date of its effectiveness upon a vote of the people. See Busch v. Turner, 26 Cal. 2d 817, 821
(1945) (Legislature may provide that statute will become operative upon occurrence of contingency).
[30] Emphasis added.
[31] 2002 Cal. Stat. ch. 697, § 1(f).
[32] Sts. High. Code §§ 2704.10, 2704.11.
[33] Id. at § 2704.4(b)(1).
[34] 2002 Cal. Stat. ch. 697, § 1 (d).

 *Page 1