[No. A116026. First Dist., Div. Two. Jan. 14, 2008.]

COASTSIDE FISHING CLUB et al., Plaintiffs and Appellants, v.
CALIFORNIA RESOURCES AGENCY et al., Defendants and Respondents.

COUNSEL

Morgan Lewis & Bockius, Thomas M. Peterson, Benjamin P. Smith; Snyder, Miller & Orton, James L. Miller and Jennifer L. Shoda for Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, Mary E. Hackenbracht, Assistant Attorney General, John Davidson and William Jenkins, Deputy Attorneys General, for Defendants and Respondents California Resources Agency and Department of Fish and Game.

Kenyon Yeates and Charity Kenyon for Defendant and Respondent Resources Legacy Fund Foundation.

OPINION

**KLINE, P. J.**—The trial court interpreted a statute as conferring authority on an executive branch agency to enter a contract to obtain private funds to defray the costs of implementing a statutory scheme for which the Legislature failed to provide adequate public funds. This appeal challenges that interpretation of the statute primarily on the ground that it is inconsistent with the rule against delegation of legislative power implicit in the doctrine of separation of powers.

### FACTS AND PROCEEDINGS BELOW

On August 27, 2004, respondents, the California Resources Agency (Agency) and the California Department of Fish and Game (DFG), which is

supervised by the Agency, entered into a memorandum of understanding (MOU) with respondent Resources Legacy Fund Foundation (Foundation), a private nonprofit organization,[1] for the purpose of facilitating implementation of the Marine Life Protection Act (MLPA). (Fish & G. Code, § 2850 et seq.)[2] As later explained in detail, the Legislature failed to appropriate funds sufficient to support the new and substantial planning responsibilities the MLPA required DFG to complete within a specified period. The MOU was designed to rectify this problem through creation of a "public-private partnership" providing the resources necessary to comply with these mandates.

Appellants, Coastside Fishing Club, a nonprofit organization representing recreational fishermen, and Michael J. Nolan, a member of the club residing in Del Norte County and a California taxpayer, claim that the MOU was not authorized by the MLPA; was improperly devised by the Agency and DFG to "appropriate" money in a manner other than that prescribed by the California Constitution (Cal. Const., art. XVI, § 7 ["Money may be drawn from the Treasury only through an appropriation made by law and upon a Controller's duly drawn warrant."]), and thereby also violated the constitutional doctrine of separation of powers (*id.*, art. III, § 3 ["The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."]).

On December 14, 2005, appellants filed in the Del Norte County Superior Court a complaint for declaratory and injunctive relief and petition for writ of mandate (Code Civ. Proc., § 1085) seeking, among other remedies, "a judgment declaring that the private funding of administrative acts and regulatory processes is unconstitutional under the California and U.S. Constitutions." On July 6, 2006, after the case had been transferred to the San

---

[1] The Foundation administers the Resources Legacy Fund (RLF), which receives grants from many other private philanthropic institutions and individuals desirous of becoming "catalysts for conserving and restoring natural landscapes, protecting and enhancing marine systems, maintaining the integrity of wild lands and rivers, and strengthening supportive policies and organizations." According to its Web site, the Foundation "operates for the benefit of and shares the same mission, staff, and operational strategy as RLF." Like RLF, the Foundation "accepts contributions, then makes grants or loans, or enters into contracts, to conserve land, water, and marine resources; assists other organizations in carrying out environmental protection projects; promotes understanding of conservation issues; and advocates for sound natural resource policies." The Foundation and RLF are both public charities within the meaning of section 501(c)(3) of the Internal Revenue Code. The Foundation is also a type I supporting organization under sections 4942(g)(4)(B)(i) and 4966(d)(4)(B)(i) of that code. RLF makes its audited financial statements and the annual disclosures it is required to make to the Internal Revenue Service, and the statements and disclosures of the Foundation, available to the public on its Web site: <http://www.resourceslegacyfund.org/rlff.html> (as of Jan. 14, 2008).

[2] All statutory references are to the Fish and Game Code unless otherwise indicated.

Francisco Superior Court, state respondents filed a motion for judgment on the pleadings, and the Foundation joined in the motion. On the same date, the Foundation demurred to appellants' pleading on the grounds that the trial court had no jurisdiction over the subject of the causes of action alleged in the pleading, and the pleading did not state facts sufficient to constitute a cause of action (Code Civ. Proc., § 430.10, subds. (a), (e)), and state respondents joined in support.

On September 6, 2006, the trial court issued an order determining that (1) a provision of the MLPA—subdivision (b)(1) of section 2855—authorized the Agency and DFG to enter into the MOU; (2) the resources provided by the Foundation under the MOU are not monies drawn on the state treasury and the MOU therefore does not involve the legislative power to appropriate money in violation of article XVI, section 7, of the California Constitution; (3) the use by an executive branch agency of public funds to seek private "matching funds" does not violate the doctrine of separation of powers set forth in article III, section 3, of our Constitution; and (4) the resources provided by the Foundation do not amount to a "gift" and the MOU therefore does not violate Government Code section 11005, which requires approval by the California Director of Finance of certain gifts or dedications to the state. For these reasons, the court granted the motion for judgment on the pleadings without leave to amend, sustained the demurrer without leave to amend, and dismissed with prejudice the complaint for declaratory and injunctive relief and petition for writ of mandate. Judgment for respondents was entered on September 21, 2006.

This timely appeal was filed on November 3, 2006.

## DISCUSSION

### I.

### *The Standard of Review*

Orders granting judgment on the pleadings or sustaining a demurrer are reviewed in this court de novo. (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 515 [101 Cal.Rptr.2d 470, 12 P.3d 720] [judgment on the pleadings]; *Filet Menu, Inc. v. Cheng* (1999) 71 Cal.App.4th 1276, 1279 [84 Cal.Rptr.2d 384] [demurrer].) " 'Because a demurrer both tests the legal sufficiency of the complaint and involves the trial court's discretion, an

appellate court employs two separate standards of review on appeal. [Citation.] . . . Appellate courts first review the complaint de novo to determine whether or not the . . . complaint alleges facts sufficient to state a cause of action under any legal theory, [citation], or in other words, to determine whether or not the trial court erroneously sustained the demurrer as a matter of law. [Citation.]' (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 879 [6 Cal.Rptr.2d 151], fn. omitted.) [¶] 'Second, if a trial court sustains a demurrer without leave to amend, appellate courts determine whether or not the plaintiff could amend the complaint to state a cause of action. [Citation.]' [Citation.]" (*Filet Menu, Inc. v. Cheng*, pp. 1279–1280.) Because appellants stand on the complaint as alleged and propose no amendments, the only question for us is whether the allegations of the complaint state any legally sufficient claims.

We do not review the reasons for the trial court's ruling; if it is correct on any theory, even one not mentioned by the court, and even if the court made its ruling for the wrong reason, it will be affirmed. (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329–330 [48 P. 117]; see also *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 [51 Cal.Rptr.2d 444, 913 P.2d 473]; *Day v. Alta Bates Medical Center* (2002) 98 Cal.App.4th 243, 252, fn. 1 [119 Cal.Rptr.2d 606].)

## II.

### *The Marine Life Protection Act*

The MLPA declares that "California's marine protected areas (MPAs)[3] were established on a piecemeal basis rather than according to a coherent plan and sound scientific guidelines. Many of these MPAs lack clearly defined purposes, effective management measures and enforcement. As a result, the array of MPAs creates the illusion of protection while falling far short of its potential to protect and conserve living marine life and habitat." (§ 2851, subd. (a).) In order to improve the design and management of the MPA system, the MLPA directs the Fish and Game Commission (Commission)—which independently establishes the policies DFG must follow in administering

---

[3] An MPA (marine protected area), which is "primarily intended to protect or conserve marine life and habitat," is "a named, discrete geographic marine or estuarine area seaward of the mean high tide line or the mouth of a coastal river . . . [which] includes marine life reserves and other areas that allow for specified commercial and recreational activities, including fishing for certain species but not others, fishing with certain practices but not others, and kelp harvesting, provided that these activities are consistent with the objectives of the area and the goals and guidelines of [the MLPA]." (§ 2852, subd. (c).)

programs and enforcing laws pertaining to fish, wildlife, and natural resources of the state—to adopt a "Marine Life Protection Program" designed to achieve legislatively specified goals. (§§ 2853, subd. (b)(1)–(6), 2859.) The Commission, which is not a party to this action, is also directed to "adopt a master plan that guides the adoption and implementation of the Marine Life Protection Program . . . and decisions regarding the siting of new MPAs and major modifications of existing MPAs." (§ 2855, subd. (a).) Like DFG, the Commission is located within the Agency; however, unlike the DFG or the Agency, the Commission is an independent constitutional body. (Cal. Const., art. IV, § 20.)

DFG's responsibilities under the MLPA are to prepare a draft master plan for consideration by the Commission, convene a "master plan team" to assist in that enterprise, and to carry out those duties in a specified manner (which is described, *post*, at pp. 1208–1211). The particular provision of the MLPA at issue, subdivision (b)(1) of section 2855, provides that in order to facilitate adoption of a master plan by the Commission, DFG "shall prepare, or *by contract shall cause to be prepared*, a [draft] master plan" compliant with the MLPA, and "shall convene a master plan team to advise and assist in the preparation of the master plan, or *hire a contractor* with relevant expertise to assist in convening such a team." (Italics added.) Appellants' chief claim is that the contracts authorized by this language are only those using public funds for the purpose of procuring expert assistance relating either to preparation of the draft master plan or the convening of a master plan team. Appellants maintain that the Foundation lacks the requisite expertise relevant to those matters[4] and that, in any case, it was not the purpose of the MOU to obtain such assistance. As appellants see it, the only and very different purpose of the MOU is simply to provide DFG private funds to defray the costs of implementing the MLPA. Appellants claim that neither the Agency nor DFG are statutorily authorized to solicit and employ private funds for that purpose, by means of contract or otherwise, and that implementation of the MLPA may be carried out only with public funds. According to appellants, the much broader interpretation of the statute adopted by the trial court cannot be reconciled with the doctrine of separation of powers embodied in article III, section 3, of the California Constitution.

Appellants also claim the funds the Foundation provided the Agency and DFG pursuant to the MOU were a gift to the state required by law to be approved by the Director of Finance. (Gov. Code, § 11005.) Because it was

---

[4] Appellants' assertion that the Foundation lacks the "relevant expertise" required by subdivision (b)(1) of section 2855 assumes, of course, that the contracts authorized by that provision are only those to procure expert assistance in the preparation of a draft master plan or convening of a master plan team. If this assumption is erroneous, because the Legislature intended also to include contracts entered into for the purpose of securing private financial assistance, appellants' claim that the Foundation lacks "relevant expertise" also fails.

not so approved, appellants claim it is void. We address this issue first because a finding that the funds were a void gift would render it unnecessary to reach the other issues presented.

## III.

### *The Funds Provided by the Foundation Were Not a Gift*

Appellants' claim that the Foundation received no consideration for the funds it provided pursuant to the MOU, which was for that reason not a "contract" (Civ. Code, § 1550), and the funds were therefore a gift to the state. Because such gifts must be approved by the Director of Finance (Gov. Code, § 11005), and the MOU was not so approved, appellants claim the gift is void. The trial court correctly rejected this claim.

By statute, consideration for a promise to pay money may consist of "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, *to which the promisor is not lawfully entitled.*" (Civ. Code, § 1605, italics added.) Appellants contend that, because the MOU "cannot be read to require DFG or the [Agency] to do anything of substance that they were not otherwise required to do by statute," the Foundation was legally entitled to the benefits provided by the MOU, and lawful consideration was therefore absent.

This argument is inexplicably indifferent to the numerous duties imposed on the Agency and DFG under the MOU that are not mandated by (but, as will be seen, are fully consistent with) the MLPA. First, unlike the MLPA, which imposes no specific duties on the Agency, the MOU requires the Secretary of the Agency to establish and appoint seven to 10 members of "a California MLPA Blue Ribbon Task Force" (Task Force) charged not only with overseeing DFG's preparation of the draft master plan, but also with "(i) preparing a comprehensive strategy for long-term funding of planning, management and enforcement of MPA's; (ii) developing a recommendation for improved coordination of the management of MPA's with federal agencies involved in ocean management; and (iii) selecting one of its members to serve as the liaison to the Central [MLPA] Coast Stakeholder Group," which the MOU requires the Task Force and DFG to create to assist it in developing proposed alternative networks of MPA's in an area along the central coast. The Agency is also obliged by the MOU, but not by the MLPA, to dedicate a senior policy level staff person to provide advice to the Task Force and its executive director, and to "provide office space, telecommunications equipment and support, and general clerical support necessary to fulfill the Agency's commitments under [the] MOU."

The MOU also expands DFG's responsibilities relating to preparation of a draft master plan beyond those mandated by the MLPA. For example, the MOU requires DFG to prepare the master plan in "phases." As part of the first phase, DFG is required to prepare and submit to the Commission a "Master Plan Framework" to be used to develop networks of MPA's within individual regions during succeeding master plan development phases; and also to expand the membership of the master plan team beyond that required by the MLPA (§ 2855, subd. (b)(3)), by adding up to eight additional scientists, reestablishing the team as "the Master Plan Science Advisory Team," and directing it not just to perform the responsibilities imposed on the master plan team by the MLPA but also to assist the MOU-created Task Force.[5] Additionally, the MOU specifies that DFG must use its best efforts to hire and fund five full-time managerial, scientific, technical and legal staff persons to provide additional assistance to the Task Force. In September and March of each year, DFG is required to provide the Foundation written semiannual reports describing its success in complying with the foregoing requirements and others.

For the foregoing reasons, appellants' claim that consideration is lacking is manifestly untenable. Because the duties the Agency and DFG promised to undertake clearly exceed those mandated by the MLPA, they provided consideration for that which the Foundation promised in return. Therefore, as the trial court concluded, the MOU is a bilateral contract with consideration on both sides of the bargain. The private funds the Foundation promised to and did provide the Agency and DFG pursuant to the MOU were not a gift to the state requiring approval by the Director of Finance. (Gov. Code, § 11005.)

## IV.

### *Respondents Were Authorized by the MLPA to Enter into the MOU, and Their Exercise of That Authority Does Not Violate the Doctrine of Separation of Powers*

### A.

The threshold question is the scope of the contracting authority conferred upon DFG by subdivision (b)(1) of section 2855.

■ "Pursuant to established principles, our first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the

---

[5] These requirements are not inconsistent with the MLPA if, as we assume, the additional scientists included in the reconstituted team possess the qualifications of team members specified in the MLPA (§ 2855).

purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation. [Citation.] Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent. [Citations.] A statute should be construed whenever possible so as to preserve its constitutionality. [Citations.]" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

Appellants claim the language of subdivision (b)(1) of section 2855 is plain. As they see it, the provision simply commands DFG to itself prepare a draft master plan, "or by contract . . . cause to be prepared a master plan," and to "convene a master plan team to advise and assist in the preparation of the master plan, or hire a contractor with relevant expertise to assist in convening such a team." Appellants maintain that the statutory language limits the assistance that may be obtained by contract to that of parties possessing the expertise necessary to either prepare the master plan or assist in convening the master plan team, and to pay for those services with public funds; it does not include contracts to procure private resources in return for the performance of public services. We cannot say appellants' view of the statute is manifestly unreasonable. Executive branch agencies are not commonly authorized to solicit and employ private funds to defray the costs of implementing public laws, because adequate appropriations of public funds for that purpose are ordinarily made by the Legislature. It is therefore not unreasonable to assume that if such an authorization was intended the Legislature would have said so explicitly.

■ Respondents acknowledge that DFG's statutory authority to enter into the MOU is not express. However, resting on the settled principle that " ' "officials may exercise such additional powers as are necessary for the due and efficient administration of powers expressly granted by statute, or as *may fairly be implied* from the statute granting the powers . . ." ' " (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 824–825 [258 Cal.Rptr. 161, 771 P.2d 1247], quoting *Rich Vision Centers, Inc. v. Board of Medical Examiners* (1983) 144 Cal.App.3d 110, 114 [192 Cal.Rptr. 455], quoting *Dickey v. Raisin Proration Zone No. 1* (1944) 24 Cal.2d 796, 810 [151 P.2d 505]), respondents claim that supplemental private funds "matching" those appropriated by the Legislature are necessary to enable DFG to implement

the MLPA, and the authority to solicit and use such funds for that purpose may fairly be implied from the contracting clauses of subdivision (b)(1) of section 2855.[6] Furthermore, respondents argue, the grant of statutory authority to enter into contracts to procure assistance in the preparation of a draft master plan or in the convening of a master plan team does not, in the absence of limiting language, preclude any particular *type* of service contract or contracts not paid for with public funds. Finally, relying on the legislative history judicially noticed by the trial court, respondents claim that the Legislature was from the outset fully aware of and acted affirmatively to bring about the "public-private partnership" the Agency and DFG were trying to create through the MOU as a means to obtain private resources to defray the cost of implementing the MLPA. Respondents contend that such acts imply a legislative belief that the MOU conforms to the legislative will.[7]

We conclude that subdivision (b)(1) of section 2855 is ambiguous as to the nature and scope of the contracts it authorizes. Because the statute is unclear, we attempt to ascertain the legislative intent by looking to its legislative history, including "the wider historical circumstances of its enactment." (*Dyna-Med, Inc. v. Fair Employment & Housing Com., supra*, 43 Cal.3d at p. 1387, citing *California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].)

## B.

As enacted in 1999, the MLPA required DFG to submit to the Commission a draft of the proposed master plan it prepared on or before January 1, 2002, and thereafter to make the draft available for public review, conduct no fewer than three public meetings, and make appropriate modifications of the draft plan. (Stats. 1999, ch. 1015, § 1.) A proposed final master plan was required to be submitted by DFG to the Commission no later than April 1, 2002, and the Commission was then required to "hold at least two public hearings . . . and the Marine Life Protection Program prior to adopting the plan and

---

[6] Though the MLPA is within respondents' administrative jurisdiction, they do not claim any "body of experience and informed judgment" entitling their interpretation of section 2855, subdivision (b)(1), to greater judicial deference than would otherwise be required. (See *Skidmore v. Swift & Co.* (1944) 323 U.S. 134, 140 [89 L.Ed. 124, 65 S.Ct. 161]; *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12–14 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

[7] In this connection, respondents also point out that when Governor Gray Davis signed the measure enacting the MLPA, he issued a message to the Legislature stating, "I am encouraging the proponents and the Department to seek assistance from private resources to help implement the provisions of the bill . . . ," indicating his belief such efforts were authorized by the measure. We do not think a Governor's post hoc signing statement is ordinarily a reliable indication of legislative intent.

program." (*Ibid.*) These statutory time lines were not met, and the Legislature twice extended them, ultimately to January 1 and April 1 of *2005*. (§ 2859, subds. (a), (b), (c).)

The DFG was unable to prepare a draft master plan even within the legislatively extended periods. As explained in a 2005–2006 analysis prepared by the Legislative Analyst's Office, DFG "began implementing the MLPA in 2000 using funds redirected from other activities. The *2003–04 Budget Act* provided $800,000 from the Environmental License Plate Fund . . . to match private funds for support of MLPA activities. However, the department was not able to secure private matching support and thus eliminated this funding as part of the overall program reductions required in the *2003–04 Budget Act*. Consequently, in early 2004, DFG halted its MLPA implementation efforts. [¶] The department's initial efforts at implementing the MLPA received considerable criticism. Concerns were raised that the process adopted by DFG of establishing MPAs did not provide for sufficient public participation, lacked a strong foundation in science, and was not sufficiently funded." (Legis. Analyst, analysis of Sen. Bill No. 77 (2005–2006) Reg. Sess.) 2005 Budget Bill for DFG, pp. B-63 to B-64.)

It bears emphasizing that DFG's funding problem did not begin with and is not confined to the MLPA. As the Legislature statutorily acknowledged as long ago as 1978, DFG "has in the past not been adequately funded to meet its mandates. The principal causes have been the fixed nature of the department's revenues in contrast with the rising costs resulting from inflation, the increased burden on the department to carry out its public trust responsibilities, and additional responsibilities placed on the department by the Legislature. This lack of funding has prevented proper planning and manpower allocation. The lack of funding has required the department to restrict warden enforcement and to defer essential management of lands acquired for wildlife conservation. *The lack of funding for fish and wildlife conservation activities other than sport and commercial fishing and hunting activities has resulted in inadequate wildlife and habitat conservation and wildlife protection programs.*" (§ 710, italics added.)

DFG's funding problems arose primarily from the fact that its activities have traditionally been supported by user fees, such as recreational hunting and fishing licenses, landing taxes, commercial licenses, permits and entitlements, and other fees for the use of resources regulated or managed by the department. As the Legislature recognized, the revenues generated by this user-based funding system declined during a period in which DFG's regulatory and program responsibilities increased. (§ 710.7, subd. (a)(1).) The Legislature acknowledged in 1990, and reaffirmed in 2006, that DFG "continues to be inadequately funded to meet its mandates," and is as a result unable

"to effectively provide all of the programs and activities required under this code and to manage the wildlife resources held in trust by the department for the people of the state." (§ 710.5, subd. (a).) Finding that "user fees are not sufficient to fund all of the department's mandates," the Legislature urged DFG to "secure a significant increase in reliable funding, *in addition to user fees.*" (§ 710.5, subd. (c).) Later, recognizing that DFG "continues to face serious funding instability due to revenue declines from traditional user fees and taxes and the addition of new and expanded program responsibilities," and that "fish and wildlife continue to be depleted, necessitating a significant portion of the department's activities to be directed toward protecting fish and wildlife for the benefit of the people of the state . . ." (§ 710.7, subd. (a)(1), (3)), the Legislature declared its intent that DFG "shall cooperate with the Legislature, recreational users, conservation organizations, the commercial fishing industry, and other interested parties *to identify and propose new alternative sources of revenue to fund the department's necessary marine conservation, restoration, and resources management, and protection respon-sibilities.*" (§ 710.7, subd. (c), italics added.) The Legislature also expressed the intent to *itself* "identify new funding sources and to secure those sources to adequately fund the department's activities directed at protecting and managing wildlife for the people of the state." (§ 710.7, subd. (d).) Although the statutes just quoted are not part of the MLPA, they are also part of the Fish and Game Code and therefore relevant to our inquiry, because " '[e]very statute should be construed with reference to the whole system of law of which it is a part, so that all may be harmonized and have effect.' " (*Mejia v. Reed* (2003) 31 Cal.4th 657, 663 [3 Cal.Rptr.3d 390, 74 P.3d 166], quoting *Moore v. Panish* (1982) 32 Cal.3d 535, 541 [186 Cal.Rptr. 475, 652 P.2d 32].)

After it became clear that DFG's limited resources rendered it unable to prepare a draft master plan within the time periods specified by the Legisla-ture, the Agency and DFG created the California Marine Life Protection Act Initiative in 2004,[8] which was designed in part to obtain private funds to supplement the inadequate public funds provided for MLPA implementation through a "public-private partnership." As the initiative states: "Due to the limited staffing and funding resources of the [Agency] and [DFG], this proposal is dependent upon supplementing public funding with private re-sources to enhance the state's capacity to accomplish the science, analysis, planning, and coordination necessary to achieve the objectives [of the MLPA] on time." The initiative is attached to the MOU as an exhibit and the MOU states that its objectives are those of the initiative.

The Legislature was made aware of the Agency's and DFG's anticipated use of private matching funds to support MLPA implementation and endorsed those efforts. According to the report of the Legislative Analyst's Office

---

[8] Details of the Marine Life Protection Act Initiative were made publicly available on DFG's Web site (<http://www.dfg.ca.gov/mrd/mlpa> [as of Jan. 14, 2008]).

referred to earlier, the administration provided $500,000 in the 2004–2005 Budget Act "for MLPA implementation and specified that the funds were to be used to leverage private resources. The department and the [Agency] subsequently entered into a partnership with a private foundation to assist in the implementation of MLPA. The department indicates a private foundation will provide $2 million for the initial implementation of MLPA." (Legis. Analyst, analysis of Sen. Bill No. 77 (2005–2006 Reg. Sess.) 2005 Budget Bill for DFG, *supra*, p. B-64.)

In the Spring of 2004, the Agency and DFG informed the appropriate Senate and Assembly budget subcommittees that they were negotiating the MOU with the Foundation, which had pledged "private matching funds" up to $2 million to pay for MLPA implementation, and that in order to take advantage of those funds DFG needed an appropriation of $500,000. (Assem. Com. on Budget, Agenda, subcom. No. 3 (Apr. 21, 2004) p. 6.) In assessing whether such an appropriation would have any other impact on the general fund, Assembly budget committee staff concluded that "[p]otentially [there would be] none if special funds can once again be utilized." (*Ibid.*) Senate staff also recommended the requested appropriation, advising the Senate budget subcommittee that budget bill language should state clearly that these funds "shall be available to match private funds." (Sen. Com. on Budget and Fiscal Review, Agenda, subcom. No. 2 (May 19, 2004) p. 35.) In accordance with the foregoing recommendations, the 2004 budget bill appropriated the $500,000 sought by the Agency and DFG "to match private funds for expenditure for activities in support of the protection and management of marine resources," including "ecological and socioeconomic studies and data compilation pursuant to the [MLPA]," and "research, monitoring, and planning efforts necessary to meet the goals of the Marine Life Protection Program." (Stats. 2004, ch. 208, Budget Item 3600-001-0647.) Respondents signed the MOU on August 27, 2004, about a month after the Governor signed the Budget Act for that year.

In the California Ocean Resources Stewardship Act of 2000 (Pub. Resources Code, §§ 36970–36973), which became law shortly after the MLPA was enacted, the Legislature noted that state agencies like DFG that have ocean and coastal management responsibilities "often lack basic information on which to base decisions," and that the "existing means for coordinating agency efforts need to be improved." (Pub. Resources Code, § 36971, subd. (e).) That act also stated that "[a]pproximately one hundred million dollars ($100,000,000) in *current, recent,* or planned marine science projects funded by the federal government, *foundations*, the University of California and California State University systems, and *private institutions* could be of great benefit to the state's coastal and ocean resource management agencies." (Pub. Resources Code, § 36971, subd. (f), italics added.) Aware of the importance of such assistance, the Legislature declared it the

policy of the state to "encourage" the contribution of "nongovernmental resources" to supplement state resources devoted to ocean resource management. (Pub. Resources Code, § 36972, subd. (b).) The need for such supplemental funds is clear from the MLPA itself, because it requires the Commission to implement the California Marine Life Protection Program with regulations based on the final master plan on or before December 1, 2005, *only "to the extent funds are [then] available."* (§ 2859, subd. (b), italics added.) Finally, when it enacted the Marine Managed Areas Improvement Act (Pub. Resources Code, §§ 36601–36700), which is statutorily coordinated with the MLPA (§ 1591, subd. (a)), the Legislature explicitly endorsed the use of "public/private partnerships," such as the MOU, "to provide access to general information and data about ocean and coastal resources within California's [Marine Managed Areas]." (Pub. Resources Code, § 36601, subd. (a)(11).)[9] Indeed, the Legislature has provided that "public-private partnerships, wherever practicable, shall be the primary means of achieving the objectives of the [California Wetlands Preservation Act]" (Pub. Resources Code, § 5811, subd. (c)), and has authorized the DFG to "accept contributions to the Coastal Wetlands Fund . . . [from, among others] private individuals and organizations [and] nonprofit organizations . . . ." (Pub. Resources Code, § 5818.2, subd. (b).)

In 2004, during the session in which it appropriated $500,000 to provide the matching funds DFG needed to leverage private resources for MLPA

---

[9] As we understand the term, a "public-private partnership" is "a project in which there is cooperation between the public and private sectors in one or more areas of the design, development, construction, operation, ownership or *financing* of infrastructure assets, or in the provision of services. Compared to traditional procurement methods, the private sector assumes a greater role in the planning, *financing*, design, construction, operation and maintenance of public facilities or service delivery." (Off. of Treasurer, Cal. Debt & Investment Advisory Com., Issue Brief: Privatization vs. Public Private Partnerships: A Comparative Analysis (Aug. 2007) p. 4, fns. omitted, italics added, available at <www.treasurer.ca.gov/cdiac/publications/privatization.pdf> [as of Jan. 14, 2008]; see also Nat. Council for Public-Private Partnerships, *How Partnerships Work* (Apr. 27, 2007) <www.ncppp.org/howpart/index.shtml> [as of Jan. 14, 2008].) Such partnerships, including those designed to provide various forms of financial assistance, have been authorized, encouraged or mandated by our Legislature in connection with such diverse purposes as the provision of educational and placement services for foster children and other youth (Ed. Code, § 48853.5, subd. (d)(6); Welf. & Inst. Code, §§ 16124, subd. (j), 16605, subds. (a), (b), 18986.2, subd. (d), 18986.11, subd. (e)); redesign and reformation of high schools (Ed. Code, § 52070, subd. (c)); construction of educational facilities (Ed. Code, § 81004, subds. (a), (b), (c)); provision of architectural and engineering services for certain infrastructure projects (Gov. Code, § 4529.10, Initiative Measure, Prop. 35 (2000), § 2(b)); assessment of technologies available for improved emergency alerts (Gov. Code, § 8593.6); satisfaction of local housing needs (Health & Saf. Code, §§ 50843, subd. (d)(1), 50843.5, subds. (a), (b)); protection, acquisition, restoration, preservation, and management of wetlands (Pub. Resources Code, §§ 5811, subd. (c), 5814, subd. (a)(3)); stewardship of agricultural and grazing land (Pub. Resources Code, § 10282, subds. (a), (e)(5)); and the improvement of water supply, quality, and infrastructure (Wat. Code, § 79205.10, subd. (c).)

implementation, the Legislature enacted the California Ocean Protection Act. (Pub. Resources Code, § 35500 et seq.) The purpose of that act, which relates to the MLPA, "is to integrate and coordinate the state's laws and institutions responsible for protecting and conserving ocean resources, including coastal waters and ocean ecosystems." (*Id.*, § 35515.) Significantly, one of the objectives of the measure is to "[u]se California's private and charitable resources more effectively in developing ocean protection and conservation strategies." (*Id.*, § 35515, subd. (d).)

■ The foregoing events and statutes may appropriately be taken into consideration in ascertaining the intent of the Legislature in enacting subdivision (b)(1) of section 2855. As we stated in *Steilberg v. Lackner* (1977) 69 Cal.App.3d 780 [138 Cal.Rptr. 378], in ascertaining legislative intent not clearly expressed, courts should take into account such matters as "the object in view, the evils to be remedied, the history of the times, [and] legislation upon the same subject, public policy and contemporaneous construction." (*Id.* at p. 785, citing *Alford v. Pierno* (1972) 27 Cal.App.3d 682, 688 [104 Cal.Rptr. 110]; *Estate of Jacobs* (1943) 61 Cal.App.2d 152, 155 [142 P.2d 454].) The fact that the Legislature, which knew funds it provided in the Budget Act were to be used to obtain "private matching funds" permitting implementation of the MLPA pursuant to an MOU with a private foundation, did not then think it necessary to explicitly indicate that such a contract was legislatively authorized suggests a legislative belief that the MLPA already provided the necessary authorization. The Legislature knew the costs of the elaborate planning process DFG and the master plan team were directed to carry out could not be paid for with the public funds it had provided. For that reason, and because preparation of the draft master plan and convening of the master plan team are the referents of the provisions of subdivision (b)(1) of section 2855 permitting contracts with private parties, the Legislature apparently concluded that DFG was authorized by that statute to enter into the MOU. In any case, the Legislature's repeated declarations, both before and after enactment of the MLPA, regarding the increasing inability of DFG's user-based funding system to support its growing responsibilities to protect marine resources, such as those imposed by the MLPA, and the need for DFG to "identify and propose new alternative sources of revenue" to fund those responsibilities (§ 710.7, subd. (c); see §§ 710, 710.5), render it difficult if not impossible to think the Legislature intended to exclude from the contracts authorized by subdivision (b)(1) of section 2855 those providing the supplemental private funds needed to enable DFG to prepare the draft master plan or convene the master plan team. In effect, the MOU represents a cooperative effort with a conservation organization "to identify and propose new alternative sources of revenue to fund [DFG's] necessary marine conservation, restoration, and resources management, and protection responsibilities," as

directed by section 710.7, subdivision (c). Because the Foundation unquestionably possesses expertise "relevant" to the type of financial or philanthropic assistance it provided under the MOU, it is a party with whom DFG is authorized by subdivision (b)(1) of section 2855 to enter into contract.

Appellants argue that when the Legislature intends to authorize the solicitation and use of private funds to achieve public purposes it does not do so by implication but employs "clear[] directive language." As an example, appellants point to Streets and Highways Code section 143, subdivision (b)(1), which authorizes the Department of Transportation to "solicit proposals, accept unsolicited proposals, negotiate, and enter into comprehensive development lease agreements with . . . private entities, or consortia thereof, for transportation projects." (See *Professional Engineers v. Department of Transportation* (1993) 13 Cal.App.4th 585, 593 [16 Cal.Rptr.2d 599] [describing this statute as authorizing "a new experimental program enlisting private financing, design, construction and operation of transportation facilities to solve state transportation needs that cannot be met with available public revenue"].) It is, of course, always preferable for the Legislature to speak clearly and avoid ambiguity, but this certainly does not mean that when it does not do so a court cannot ascertain legislative intent by going beyond the language and examining the legislative history of the statute and, in this case more significantly, "the wider historical circumstances of its enactment." (*Dyna-Med, Inc. v. Fair Employment & Housing Com., supra*, 43 Cal.3d at p. 1387.) The historical factors we have described satisfactorily demonstrate that, facially ambiguous as the language of subdivision (b)(1) of section 2855 may be, the contracts authorized by that statute include those to obtain private resources that, given the dearth of available public funds, were necessary to enable DFG to prepare a master plan and convene a master plan team to assist in those statutorily mandated efforts.

■ We are also mindful that "[l]aws providing for the conservation of natural resources are of great remedial and public importance and thus should be construed liberally . . ." (*San Bernadino Valley Audubon Society v. City of Moreno Valley* (1996) 44 Cal.App.4th 593, 601 [51 Cal.Rptr.2d 897]) so as to promote the general object sought to be accomplished (*Alford v. Pierno, supra*, 27 Cal.App.3d at p. 688). ■ Because the narrow interpretation of subdivision (b)(1) of section 2855 urged by appellants would obstruct the purpose of the MLPA, we cannot accept it *unless*, as appellants maintain, the only competing interpretation would unconstitutionally delegate a legislative power to an executive branch agency, because "[a] statute should be construed whenever possible so as to preserve its constitutionality. [Citations.]" (*Dyna-Med, Inc. v. Fair Employment & Housing Com., supra*, 43 Cal.3d at p. 1387.) That is not, however, the case.

## C.

The trial court's determination that the resources provided by the Foundation under the MOU are not monies drawn on the state treasury and therefore not an "appropriation" within the meaning of article XVI, section 7, of the California Constitution was unquestionably correct. However, the theory that the power to solicit and use private funds for a public purpose constitutes an "appropriation" within the meaning of the Constitution is not crucial to appellants' separation of powers claim. As we understand that claim, it rests on the broader premise that he who pays the piper invariably calls the tune. That is, even if the funds provided by the Foundation pursuant to the MOU are not an "appropriation" in the constitutional sense, permitting an executive branch agency to confer on certain private interests—those able and willing to commit private resources to the implementation of a publicly underfunded statutory scheme in which they are self-interested—would provide certain private parties a degree of power and authority enabling them to subordinate legislatively defined public interests to their private interests. Thus, the complaint and writ petition assert that "[p]rivate funding arrangements like that contained in the MOU provide the California [L]egislature with 'off the books' funding for a myriad of California laws. If private funding such as that provided by the MOU is sanctioned, the [L]egislature can elect to under-fund a variety of important laws, knowing that special interests most affected by a law will bridge any funding shortfall. In the end, the MOU, and agreements like it, open the door for special interests to bid against one another in order to develop and draft California laws and regulations."

 To the extent that the foregoing statements suggest it is bad policy for the Legislature to refuse to appropriate public funds necessary to carry out its mandates and instead authorize the executive agencies subject to those mandates to seek and employ private funds for that purpose, we express no opinion. In reviewing statutes enacted by the Legislature, courts " 'may not undertake to evaluate the wisdom of the policies embodied in such legislation; absent a constitutional prohibition, the choice among competing policy considerations in enacting laws is a legislative function.' " (*Marine Forests Society v. California Coastal Com.* (2005) 36 Cal.4th 1, 25 [30 Cal.Rptr.3d 30, 113 P.3d 1062], quoting *Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 53 [51 Cal.Rptr.2d 837, 913 P.2d 1046].) We therefore confine our analysis to what we believe is the essence of appellants' constitutional claim: that construing subdivision (b)(1) of section 2855 as granting DFG authority to enter into a contract for the purpose of obtaining private funds to defray the cost of implementing the MLPA would violate "[t]he nondelegation doctrine [that] is rooted in the principle of separation of powers that underlies our tripartite system of Government." (*Mistretta v. United States* (1989) 488 U.S. 361, 371 [102 L.Ed.2d 714, 109 S.Ct. 647].)

■ In assessing this claim we must keep in mind that "the primary purpose of the separation of powers doctrine 'is to prevent the combination in the hands of a single person or group of the basic or fundamental powers of government.' (*Parker v. Riley* (1941) 18 Cal.2d 83, 89 [113 P.2d 873].) 'The doctrine has not been interpreted as requiring the rigid classification of all the incidental activities of government, with the result that once a technique or method of procedure is associated with a particular branch of the government, it can never be used thereafter by another.' (*Id.* at p. 90) The separation of powers doctrine 'recognizes that the three branches of government are interdependent, and it permits actions of one branch that may "significantly affect those of another branch." [Citation.]' (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 298 [105 Cal.Rptr.2d 636, 20 P.3d 533].) The doctrine ' "is not intended to prohibit one branch from taking action properly within its sphere that has the *incidental* effect of duplicating a function or procedure delegated to another branch." [Citation.]' (*Ibid.*)" (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 557 [117 Cal.Rptr.2d 168, 41 P.3d 3].) Moreover, the case law demonstrates that, as "[t]ime has blurred the purity of division of governmental functions" (*Imperial Irrigation Dist. v. State Wat. Resources Control Bd.* (1990) 225 Cal.App.3d 548, 565 [275 Cal.Rptr. 250]), the rule against delegation of legislative power "has yielded to the growing necessity for delegation to boards and officers of a large measure of discretionary power that is ordinarily considered legislative in character." (7 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 166, p. 299.) Thus federal and state courts have countenanced delegations of an extraordinarily broad array of powers, not only to governmental regulatory agencies (see, e.g., *Mistretta v. United States, supra*, 488 U.S. 361; *Touby v. United States* (1991) 500 U.S. 160 [114 L.Ed.2d 219, 111 S.Ct. 1752]; *Lichter v. United States* (1948) 334 U.S. 742 [92 L.Ed. 1694, 68 S.Ct. 1294]; *United States v. Grimaud* (1911) 220 U.S. 506 [55 L.Ed. 563, 31 S.Ct. 480]; *Duskin v. State Board of Dry Cleaners* (1962) 58 Cal.2d 155 [23 Cal.Rptr. 404, 373 P.2d 468]; *Wotton v. Bush* (1953) 41 Cal.2d 460 [261 P.2d 256]; *Bank of Italy v. Johnson* (1926) 200 Cal. 1 [251 P. 784]), but as well to private groups[10] (see Jaffe, *Law Making By Private Groups*

---

[10] Suggested explanations for the amount and scope of legislative delegation that takes place include not just the need to leave technical questions to experts, which most obviously explains the delegation of authority by the MLPA, but also "politicians' desire to duck blame for unpopular choices or to create new opportunities for constituency service, the inability of multimember legislatures to reach stable consensus, and the impossibility (or excessive cost) of anticipating and resolving all implementation issues in advance." (Stephenson, *Legislative Allocation of Delegated Power: Uncertainty, Risk, and the Choice Between Agencies and Courts* (2006) 119 Harv. L.Rev. 1035, 1036–1037, fns. omitted.)

(1937) 51 Harv. L.Rev. 201; Abramson, *A Fifth Branch of Government: The Private Regulators and Their Constitutionality* (1989) 16 Hastings Const. L.Q. 165).[11]

■ The federal test of the validity of a statutory delegation is whether the statute "sufficiently marks the field within which the Administrator is to act so that it may be known [by a reviewing court] whether he has kept within it in compliance with the legislative will." (*Yakus v. United States* (1944) 321 U.S. 414, 425 [88 L.Ed. 834, 64 S.Ct. 660]; accord, *Mistretta v. United States, supra,* 488 U.S. 361; *Hampton & Co. v. United States* (1928) 276 U.S. 394 [72 L.Ed. 624, 48 S.Ct. 348, Treas.Dec. 42706.) Our courts apply a similar test. Where the Legislature, expressly or by implication, "lays down a sufficiently clear test or standard, the discretion to carry out the legislative purposes by rules and regulations may be given to a board or officer." (7 Witkin, Summary of Cal. Law, *supra,* Constitutional Law, § 167, p. 301.) The doctrine prohibiting delegation of legislative power was thoroughly explicated by Justice Tobriner in *Kugler v. Yocum, supra,* 69 Cal.2d 371. Noting that the doctrine is well established in California, he emphasized that its scope has been limited by several equally well-established principles. "For example, legislative power may properly be delegated if channeled by a sufficient standard. 'It is well settled that the legislature may commit to an administrative officer the power to determine whether the facts of a particular case bring it within a rule or standard previously established by the [L]egislature . . . .' [Citations.] [¶] A related doctrine holds: 'The essentials of the legislative function are the determination and formulation of the legislative policy. Generally speaking, attainment of the ends, including how and by what means they are to be achieved, may constitutionally be left in the hands of others. The Legislature may, after declaring a policy and fixing a primary standard, confer upon executive or administrative officers the "power to fill up the details" by prescribing administrative rules and regulations to promote the purposes of the legislation and to carry it into effect . . . .' [Citation.]
■ Similarly, the cases establish that '[w]hile the legislative body cannot delegate its power to make a law, it can make a law to delegate a power to

---

[11] The feeling that the doctrine prohibiting delegation of legislative power has been, as Justice Marshall said, "virtually abandoned by the [Supreme] Court for all practical purposes" (*FPC v. New England Power Co.* (1974) 415 U.S. 345, 352–353 [39 L.Ed.2d 383, 94 S.Ct. 1151] (conc. opn. of Marshall, J.)) and is now "moribund" (*id.* at p. 353 (dis. opn. of Marshall, J.); see *National Cable Television Assn. v. U. S.* (1974) 415 U.S. 336 [39 L.Ed.2d 370, 94 S.Ct. 1146]), accounts for the fact that judicial applications of the doctrine have been "much criticized." (*Kugler v. Yocum* (1968) 69 Cal.2d 371, 375 [71 Cal.Rptr. 687, 445 P.2d 303]; see, e.g., Schoenbrod, Power Without Responsibility: How Congress Abuses the People Through Delegation (1993); 1 Davis, *Administrative Law Treatise* (2d ed. 1978) at p. 193 ["[t]he case law has not crystallized any consistent principles"].) In the Supreme Court, the nondelegation doctrine is now largely limited to statutory interpretation (*Mistretta v. United States, supra,* 488 U.S. 361, 373, fn. 7), the sole purpose for which appellants raise it in this case.

determine some fact or state of things upon which the law makes or intends to make its own action depend.' [Citation.]" (*Id.* at pp. 375–376.) "[*T*]*he purpose of the doctrine that legislative power cannot be delegated is to assure that 'truly fundamental issues [will] be resolved by the Legislature' and that a 'grant of authority [is] . . . accompanied by safeguards adequate to prevent its abuse.'* [Citations.]" (*Id.* at p. 376, italics added.) Stated differently, the courts are less concerned with "avoiding a mixture of three or more kinds of power in the same agency [than with] *avoiding or minimizing unchecked power.*" (*McHugh v. Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348, 361–362 [261 Cal.Rptr. 318, 777 P.2d 91].)

Appellants' claim that the MLPA lacks the necessary safeguards rests on cases involving the delegation of rulemaking authority. *Bayside Timber Co. v. Board of Supervisors* (1971) 20 Cal.App.3d 1 [97 Cal.Rptr. 431] (*Bayside Timber*), the case appellants rely upon most heavily, is illustrative.

The issue in *Bayside Timber* was whether the Z'berg-Nejedly Forest Practice Act of 1973 (Pub. Resources Code, § 4511 et seq.) impermissibly delegated legislative power to private timber owners and operators. After explaining the composition of the State Board of Forestry and "district forest practice committees" created by the forest practice act (*Bayside Timber, supra,* 20 Cal.App.3d at p. 9), whose memberships consisted almost entirely of private timber owners or operators, and the rulemaking powers of such bodies, the court summarized the relevant portions of the act as follows: "The content of the rules under which private logging operations are conducted is decreed exclusively by persons pecuniarily interested in the timber industry, i.e., timber owners and operators. The ultimate basis of this exclusive control rests in the hands of the 'private timber ownership,' two-thirds of which must agree before *any* proposed rule may be adopted. Ordinarily such rules are formulated by the four timber owners or operators of the forest practice committee, but they may nevertheless be drafted by the district's private timber ownership. The rules are submitted to the State Board of Forestry which may approve or disapprove them. It is noteworthy that the [B]oard is powerless itself to promulgate any forest practice rule. It may only approve or disapprove those which are submitted. [¶] It follows that without agreement of the 'private timber ownership,' no power in California has authority to impose rules to insure reasonable environmental and public protection from logging abuses." (20 Cal.App.3d at p. 10.)

The *Bayside Timber* court pointed out that the legislative delegation at issue not only gave timber owners and operators "the exclusive power to formulate forest practice rules which, when adopted, have the force and effect of law," but laid down "no guides or standards" to prevent abuse of the discretion conferred. (*Bayside Timber, supra,* 20 Cal.App.3d at p. 10.) "The

combination of forest practice committees and timber ownership, in their *absolute* discretion, are free to formulate, or not formulate, rules tending to prevent erosion, to lessen flooding, to protect wildlife, to preserve natural beauty, or otherwise to serve the public interest. As such rules are formulated, whether they be in the public interest or timber industry interest, or otherwise reasonable or effective, is likewise left to the *uncontrolled* discretion of the committee and the timber ownership." (*Id.* at pp. 10–11, fn. omitted, italics added.) The court concluded that the forest practice act violated the state and federal Constitutions because it "unlawfully and without proper, or any, standards delegates legislative power, and otherwise denies due process of law to the interested and affected public." (*Bayside Timber*, at p. 14; accord, *State Board v. Thrift-D-Lux Cleaners* (1953) 40 Cal.2d 436, 448 [254 P.2d 29]; *Allen v. California Board of Barber Examiners* (1972) 25 Cal.App.3d 1014, 1017 [102 Cal.Rptr. 368]; *People's etc. L. Assn. v. Franchise Tax Bd.* (1952) 110 Cal.App.2d 696, 700 [243 P.2d 902]; see also *Carter v. Carter Coal Co.* (1936) 298 U.S. 238, 311 [80 L.Ed. 1160, 56 S.Ct. 855].)

The difference between the absolute delegations of rulemaking authority invalidated in *Bayside Timber, supra,* 20 Cal.App.3d 1, 10, and the similar cases just cited, and the delegation challenged in this case, could hardly be sharper.

 To begin with, the MLPA does not delegate power *to adopt rules* even to the Agency or the DFG, let alone to any entity with which the DFG may contract. As earlier noted, the power to adopt a Marine Life Protection Program and a final master plan that guides the adoption and implementation of that Program is given by the MLPA *solely* to the Commission, an independent constitutional body consisting of five members appointed by the Governor and approved by the Senate, to which "[t]he Legislature may delegate . . . such powers relating to the protection and propagation of fish and game as the Legislature sees fit." (Cal. Const., art. IV, § 20.) The Commission is not required to adopt the draft master plan proposed to it by the DFG, and may accept the proposed plan, modify it, or reject it and adopt a completely different plan.[12]

---

[12] The fact that the delegation to DFG of authority to prepare the draft master plan and convene a master plan team, or contract out those responsibilities, is not a delegation of rulemaking authority does not, however, end the matter, because a delegation also violates the nondelegation doctrine where it empowers such a party to "*initiate* . . . rules that acquired the force of law." (*King v. Meese* (1987) 43 Cal.3d 1217, 1234 [240 Cal.Rptr. 829, 743 P.2d 889], italics added.) The MLPA gives DFG or a party with whom it contracts the power to prepare the draft master plan "that guides the adoption and implementation of the Marine Life Protection Program adopted pursuant to [the MLPA]." (See § 2855, subd. (a).) Due to some uncertainty as to the meaning of the word "initiate" as used in *King v. Meese,* we shall assume, without deciding, that the delegation challenged in this case is an initiatory power that can properly be delegated only with the requisite safeguards.

It is also worth emphasizing that, while it is a private entity, the Foundation does not have a pecuniary interest in the manner in which the MLPA is implemented and enforced; and foundations are among the educational and other private institutions that have helped fund marine science projects in California like those mandated by the MLPA. (Pub. Resources Code, § 36971, subd. (f); see also Pub. Resources Code, § 5818.2, subd. (b).) The trial court's ruling that the MOU was authorized by subdivision (b)(1) of Fish and Game Code section 2855 therefore does not imply that the statute authorizes the DFG to contract with a party having such a self-interest and, despite some of their rhetoric, appellants do not challenge the ruling on the ground that the Foundation has a disqualifying special interest of any sort or lacks expertise relevant to the provision of philanthropic assistance. Because appellants' claims focus entirely on the nature of the assistance the DFG is statutorily authorized to obtain by means of a contract, this case does not require us to inquire into the nature or interests of the service provider. Nothing in this opinion should be thought to bear upon whether an executive agency may be authorized legislatively to enter into a contract with or receive financial contributions from a private party to assist in the implementation of a statute that might apply to that party or effect its pecuniary interests in any way.

With the foregoing considerations in mind, we move to the central question whether, if the trial court's interpretation of subdivision (b)(1) of section 2855 were accepted, the MLPA would impermissibly delegate to the DFG or those with whom it contracts the power to resolve "truly fundamental issues" constitutionally committed to the Legislature, because the MLPA fails to establish effective mechanisms, or safeguards, containing the discretion of the DFG or its contractors, enabling them to distort or obstruct enforcement of the Legislature's policy decisions. (*Kugler v. Yocum, supra,* 69 Cal.2d 371, 376–377.)

As we have seen, the fundamental issue the MLPA addresses is the need "to modify the existing collection of MPAs to ensure that they are designed and managed according to clear, conservation-based goals and guidelines that take full advantage of the multiple benefits that can be derived from the establishment of marine life reserves" (§ 2851, subd. (h)), through promulgation of a comprehensive Marine Life Protection Program. Delegating the power to adopt such a program and an implementing master plan to the Commission (§ 2853), the Legislature delegated to the DFG the duty to prepare and submit to the Commission a draft master plan guiding adoption and implementation of the Marine Life Protection Program. (§ 2855, subds. (a), (b)(1).) We conclude that the delegation to the DFG contains safeguards adequately ensuring that the draft master plan it prepares or causes to be prepared conforms to the legislative will.

First, by specifying the six "goals" of the Marine Life Protection Program and the five "elements" the program must contain (§ 2853, subds. (b), (c)), the Legislature has elaborately cabined the substance and scope of the master plan.[13] DFG's authority to prepare the draft master plan and convene the required "master plan team," and to obtain assistance in those efforts, is also statutorily constrained. DFG and the master plan team are mandated to "use the best readily available scientific information" and the draft plan must "use and build upon the findings of the Sea Grant survey of protected areas in California waters, which is entitled 'California's Marine Protected Areas,' the report of the State Interagency Marine Managed Areas Workgroup, the Department of Parks and Recreation's planning information and documents regarding existing and potential underwater parks and reserves, maps and other information from the department's marine nearshore ecosystem mapping project, and other relevant planning and scientific materials." (§ 2856, subd. (a)(1).)

The 11 "components" of the master plan are not only clearly identified but extraordinarily specific. (§ 2856, subd. (a)(2)(A)–(K).) To take just several of many possible examples, the MLPA not only requires the master plan to include "[r]ecommendations for the extent and types of habitat that should be represented in the MPA system and in marine life reserves," but specifies that habitat types described on maps must include "rocky reefs, intertidal zones, sandy or soft ocean bottoms, underwater pinnacles, sea mounts, kelp forests, submarine canyons, and seagrass beds." (§ 2856, subd. (a)(2)(A).) The master plan must not only identify "species or groups of species likely to benefit

---

[13] The six goals are: "(1) To protect the natural diversity and abundance of marine life, and the structure, function, and integrity of marine ecosystems. [¶] (2) To help sustain, conserve, and protect marine life populations, including those of economic value, and rebuild those that are depleted. [¶] (3) To improve recreational, educational, and study opportunities provided by marine ecosystems that are subject to minimal human disturbance, and to manage these uses in a manner consistent with protecting biodiversity. [¶] (4) To protect marine natural heritage, including protection of representative and unique marine life habitats in California waters for their intrinsic value. [¶] (5) To ensure that California's MPAs have clearly defined objectives, effective management measures, and adequate enforcement, and are based on sound scientific guidelines. [¶] (6) To ensure that the state's MPAs are designed and managed, to the extent possible, as a network." (§ 2853, subd. (b)(1)–(6).)

The five elements the program must include are: "(1) An improved marine life reserve component consistent with the guidelines in subdivision (c) of Section 2857. [¶] (2) Specific identified objectives, and management and enforcement measures, for all MPAs in the system. [¶] (3) Provisions for monitoring, research, and evaluation at selected sites to facilitate adaptive management of MPAs and ensure that the system meets the goals stated in this chapter. [¶] (4) Provisions for educating the public about MPAs, and for administering and enforcing MPAs in a manner that encourages public participation. [¶] (5) A process for the establishment, modification, or abolishment of existing MPAs or new MPAs established pursuant to this program, that involves interested parties, consistent with paragraph (7) of subdivision (b) of Section 7050, and that facilitates the designation of MPAs consistent with the master plan adopted pursuant to Section 2855." (§ 2853, subd. (c)(1)–(5).)

from MPAs, and the extent of their marine habitat, with special attention to marine breeding and spawning grounds," but also provide relevant information pertaining to "oceanographic features, such as current patterns, upwelling zones, and other factors that significantly affect the distribution of those fish or shellfish and their larvae." (§ 2856, subd. (a)(2)(B).) Nor is it enough under the MLPA for the master plan to simply recommend a network of MPA's. Pursuant to section 2856, subdivision (a)(2)(D) and (F), the MPA siting alternatives recommended by the plan must be capable of achieving the statutorily specified goals of the Marine Life Protection Program (§ 2853), and conform to five siting guidelines that are also statutorily specified (§ 2857, subd. (c)). The master plan must also include a "[a] simplified classification system" that is also consistent with specified goals and guidelines. (§ 2856, subd. (a)(2)(E).)

The impartiality and integrity of the draft master plan DFG or a contractor prepares, and the transparency of the preparation process, is ensured not only by the requirement that numerous "siting workshops" open to all interested persons be convened in each "biogeographical region" to review "alternatives for MPA networks and to provide advice on a preferred siting alternative" (§ 2857, subd. (a)), but as well by the requirement of "a process for external peer review of the scientific basis for the master plan" (§ 2858, see also § 7062).[14] Before submitting a proposed final master plan to the Commission, DFG must make the draft master plan available for public review and conduct not less than three public meetings. (§ 2859, subd. (b).)

DFG's discretion to select the membership of the master plan team, and the derivative discretion of any contractor with whom DFG may contract for assistance in convening the team, is also severely limited. To begin with, members of the team are required to "have expertise in marine life protection and shall be knowledgeable about the use of protected areas as a marine ecosystem management tool." (§ 2855, subd. (b)(2).) Members "shall also be familiar with underwater ecosystems found in California waters, with the biology and habitat requirements of major species groups in the state's marine waters, and with water quality and related issues." (*Ibid.*) The MLPA specifies that the team "shall be composed of . . . [¶] [A] [s]taff from [DFG], the Department of Parks and Recreation, and the State Water Resources Control Board, to be designated by each of those departments . . . , [¶] [B] [f]ive to seven members who shall be scientists, one of whom may have

---

[14] The transparency required by the MLPA is also required by the MOU with respect to the work of the Task Force and science team it creates. The MOU provides that those bodies "will convene in publicly-noticed and open meetings whenever a majority of the members is scheduled to be present" and they are also obliged to "provide regular opportunities for stakeholder and public input" to their decisionmaking, and to make available all "final work products pursuant to [the] MOU." The funding description provided by the Foundation is also required to be made available to the public.

expertise in the economics and culture of California coastal communities [and] [¶] [C] [o]ne member, appointed from a list prepared by Sea Grant marine advisers,[15] who shall have direct expertise with ocean habitat and sea life in California marine waters." (§ 2855, subd. (b)(3)(A), (B), (C).)

The MLPA also specifies other participants who must be involved in the planning process. The master plan must be prepared with the "advice, assistance, and involvement of participants in the various fisheries and their representatives, marine conservationists, marine scientists, and other interested persons. In preparing the master plan, [DFG] shall [also] confer, to the extent feasible, with the commission, the Pacific Fishery Management Council, the National Marine Fisheries Service, the United States Navy, the United States Geological Survey's national biological survey, staff from national marine sanctuaries off California, Sea Grant researchers, marine advisers, and national parks personnel." (§ 2855, subd. (b)(4).) In carrying out its responsibilities, DFG "may engage other experts" (§ 2855, subd. (b)(5)), and "shall take into account relevant information from local communities, and shall solicit comments and advice for the master plan from [other] interested parties" on a nonexclusive list of specified issues. (§ 2855, subd. (c).)

■ The foregoing requirements of the MLPA demonstrate that the determination and formulation of legislative policy is not left in the hands of DFG, and certainly not in those of any private party with whom it may contract for assistance. Judicially enforceable standards identify the substantive issues required to be addressed in the master plan, ensure that those who prepare the draft master plan are scientifically qualified to do so, specify the transparent manner in which the plan is prepared, the persons and interest groups that must be invited to participate in the planning process, the experts who must be consulted, and the objectivity and quality of the scientific information relied upon. These many specifications significantly limit the discretionary authority of DFG and those with whom it contracts for assistance (including financial assistance) to produce a draft master plan that departs from the goals of the MLPA. The Legislature "effectively resolve[d] the truly fundamental issues" (*Kugler v. Yocum, supra,* 69 Cal.2d at p. 376); it has not delegated that function to others nor failed to establish "effective mechanism[s] to assure the proper implementation of its policy decisions." (*Id.* at pp. 376–377.)

■ The trial court correctly determined that the MOU was authorized by subdivision (b)(1) of section 2855, and the result of that ruling does not compromise the doctrine of separation of powers and therefore does not violate article III, section 3 of the California Constitution.

---

[15] Sea Grant is a nationwide network administered through the National Oceanic and Atmospheric Administration, consisting of 30 university-based programs that work with coastal communities.

## DISPOSITION

The judgment of the trial court dismissing the complaint for declaratory and injunctive relief and petition for writ of mandate with prejudice is affirmed.

Haerle, J., and Richman, J., concurred.